[No. 29985. Department One. November 26, 1946.]

PUGET SOUND BRIDGE & DREDGING COMPANY, *Appellant,* v.
THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent.*[1]

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* for appellant.

*The Attorney General, Harry L. Parr* and *Phil H. Gallagher, Assistants,* for respondent.

SCHWELLENBACH, J.—This is an appeal from a superior court judgment affirming a ruling of the joint board of the department of labor and industries sustaining the action of the supervisor of industrial insurance in denying the right of the appellant to use the experience rating credit of the Associated Shipbuilders, which appellant and another corporation had operated under a joint venture, and dismissing the action.

For many years, the Puget Sound Bridge & Dredging Company (hereinafter called Puget Sound) has specialized in heavy engineering construction, dredging, bridge construction, and ship building at its plant located on Harbor Island. For a number of years, the Lake Union Dry Dock & Machine Works (hereinafter called Lake Union)

[1]Reported in 174 P. (2d) 541.

has carried on extensive operations at its location on Lake Union. On September 19, 1940, these two corporations entered into what they termed a "Shipbuilding Joint Venture Agreement" under the name of Associated Shipbuilders (hereinafter called Associated). The agreement provided that they form the joint venture "for the purpose of bidding for, taking and completing contracts for the construction, reconstruction and repair of ships and vessels"; that each party was to share the profits and losses alike; that the hulls were to be constructed at the plant of the Puget Sound and then taken to the plant of Lake Union for the installation of equipment; for a joint bank account, checks to be signed by representatives of both parties; for the borrowing of money for operations, and each party to be jointly and severally liable on the notes; for a separate bookkeeping account of the joint venture, to be kept in the name of Associated; that the joint venturers should render accounts to each other from time to time.

On April 14, 1943, there was executed by the parties a "Memorandum of Modification." It provided that new construction was to be confined to the completion of existing contracts and those that might thereafter be undertaken for the joint venture by mutual consent; that, subject to the foregoing, each party should be at liberty to contract for and perform any work for its own account and to use its own plant and facilities without liability or accounting to the joint venture or the other party; that Lake Union agreed that Puget Sound should have a prior right to rent or purchase certain government-owned facilities at Puget Sound's plant.

On January 18, 1944, a subsequent "Memorandum of Agreement" was entered into. It provided that the then present construction work should be completed by the joint venture, but that certain new contracts should be recognized as contracts for Puget Sound, and that Associated should have no interest therein or in any other contract theretofore or thereafter entered into by Lake Union or Puget Sound in their respective names. It provided for

arrangements to liquidate the joint venture and to indemnify each party by the other.

The controversy arose in this manner: During its operations, the joint venture, under the name of Associated Shipbuilders, reported to the department of labor and industries, was given account number 106876, and the employees were classified as No. 9-1. The account was established November 18, 1940. Puget Sound first started reporting under No. 9-1 in August, 1943. It was assigned a base for 9-1 as distinguished from the rate earned up to that time by Associated.

Shortly prior to the entering into of the joint venture agreement, Puget Sound submitted a bid to the navy on various lots of barges. One bid was accepted on its promise to build the hull in the graving dock at its Harbor Island plant and then outfit the ship at the Lake Union plant. This resulted in the formation of the joint venture. However, later, the Harbor Island plant was completely outfitted by installation of facilities by the government itself at the Puget Sound plant. Although it was originally intended that the hulls were to be constructed at Harbor Island and then taken to Lake Union for outfitting, this never happened. Before the ships were ready, the government had completed its installations at Harbor Island, and none of those constructed there were ever installed at Lake Union.

Commencing in late 1943, Puget Sound took additional contracts in its own name for construction at Harbor Island and in which Lake Union did not participate. From that time on, the contracts taken by Puget Sound were on the ascending scale, and contracts taken by the Associated were on the descending scale. As to the personnel, the same organziation that carried on the Associated work carried on the Puget Sound work. The entire operation was done without any difference in management or supervision, or any difference in policies.

About July 1, 1943, the checks issued to employees were changed from Associated to Puget Sound. As to this transaction, the auditor testified:

"Q. Now, why was that change made at that time? A. The change was made because the work on Puget Sound contracts had reached a point where it was about equal to or greater than the work on the Associated contracts; having to order new checks and knowing it was coming in the future, we ordered Puget Sound Bridge & Dredging Company checks instead of Associated Shipbuilders' checks. Q. Now, as to your actual procedure in your accounting work, were there any changes at that time? A. No. It was merely a matter of putting a new name at the head of the registers or all pay rolls. The same books and records were used. I'd like to correct that too, a new page was inserted in a register starting with a new name. In other words, we had pay roll register with Associated Shipbuilders up to one point. Next day we put in a new page Puget Sound Bridge & Dredging Company and went on from there."

The auditor also testified that, in the transition from Associated to Puget Sound, there was no change in the contracts had between the management and labor unions nor in the seniority rights of the laborers or in any other relationship with the yard, and that the only change which an employee would know about would be by the color and name on his pay check.

The records of the department show that the last payroll report of the Associated was made July 25, 1944; that Lake Union has maintained an account since 1918; and that Puget Sound first started reporting in August, 1943, and, on July 17, 1944, asked the department to give it the earned rating of Associated.

The problem for us to determine is whether or not there has been a change of employer which would prevent Puget Sound from being entitled to the merit rating earned by Associated.

Chapter 38, Laws of 1939, p. 413, § 1 (Rem. Rev. Stat. (Sup.), § 7676 [P.P.C. § 717-1]), with reference to this question, provides:

"Every employer who shall enter into any business, or who shall resume operations in any work or plant after the final adjustment of his payroll in connection therewith, shall, before so commencing or resuming operations, as the case may be, notify the Director of Labor and Industries of

such fact, accompanying such notification with an estimate of his payroll and workmen hours for the first calendar month of his proposed operations, and shall make payment of the premium on such estimate. Every such employer shall be liable for a premium of at least such estimate. Every such employer shall pay the full basic rate until such time as an experience rating in excess of a one, two, three or four year period may be computed as of a first succeeding September first date, and shall be liable for a premium of at least one dollar ($1.00) per month irrespective of the amount of his workmen hours reported during said month to the Department."

Chapter 41, Laws of 1939, p. 122, § 2 (Rem. Rev. Stat. (Sup.), § 7675 [P.P.C. § 709-1]), defines employer as follows:

"Except when otherwise expressly stated, employer means any person, body of persons, corporate or otherwise, and the legal personal representatives of a deceased employer, all while engaged in this state in any extrahazardous work, by way of trade or business, or who contracts with one or more workmen, the essence of which is the personal labor of such workman or workmen, in extrahazardous work."

*Nystrom v. Department of Labor & Industries,* 175 Wash. 6, 26 P. (2d) 620, was an action in which Nystrom, in 1926, as an employer, brought himself under the workmen's compensation act in two extrahazardous enterprises: (1) logging and (2) operating a tie mill. These operations were separately classified under the act and carried different industrial insurance and medical aid rates. The department, however, opened and carried both of Nystrom's enterprises under one account, being numbered 41439. Both operations ceased and the account was marked closed as of October 16, 1926. By letter dated April 29, 1929, Nystrom notified the department that he was putting up a tie mill and asked for information. On May 5, 1929, the department advised him as to making reports and gave him rates for tie mill operations. He then made payroll reports for May and June, and his old account, No. 41439, was marked "Re-opened." No payroll report had ever been made by Nystrom on logging operations after the account was closed

in 1926, and he only made the two reports on tie mill operations. From time to time, he reported "Not operating."

The department mailed certain blanks to Nystrom on May 8, 1930, but no report on payrolls was forthcoming until July 18, 1930, when Mrs. Nystrom made such a report on "logging" operations. This was six weeks after his death. She filed a claim with the department, asserting that her husband's death was the result of injuries sustained in logging operations. The department denied the claim; whereupon she appealed to the joint board, which affirmed the order of the department. She then appealed to the superior court, which reversed the order of the joint board. In reversing the superior court, this court held, p. 9:

"It is appellant's contention that Nystrom's account was never reopened for logging operations, and we think this contention must be sustained. It will be remembered that the account (41439) was opened for two operations—tie mill and logging; that these operations fall in different classifications and carry different rates; that the account was closed October 16, 1926; that it was reopened in 1929 only as a tie mill operation; that it was carried after that only as a tie mill operation.

"The statute, Rem. Rev. Stat., § 7676, provides: [Quoting section.]

"No claim is made that Nystrom complied with this provision other than, as above indicated, for the tie mill operation.

"But respondent contends that the reopening of account No. 41439 brought Nystrom within the scope of the act for logging, as well as tie mill operation. We do not think the contention is supported either by the facts or law. Carrying the two operations under one account was purely a matter of office administration or bookkeeping in the department. It had nothing to do with the segregation or classification of the two operations.

"The two operations were not, and could not be made, a unit simply because they were carried under the one account. When that account was closed in October, 1926, it was closed as to both operations. It could be reopened either as to one or the other or both of the operations only by compliance with Rem. Rev. Stat., § 7676, *supra*. Nystrom complied with it only as to the tie mill operation. We are

of the opinion that he wholly failed to comply with the above quoted portion of Rem. Rev. Stat., § 7676, before resuming his logging operations. He was, therefore, not operating under the act at the time he was injured."

Respondent contends that the ruling in the case of *Monroe Logging Co. v. Department of Labor & Industries*, 21 Wn. (2d) 800, 153 P. (2d) 511, is controlling in this case. There, on November 10, 1941, two corporations, the Jamison Mill Company and the Lyman Timber Company, acquired the assets of the Monroe Logging Company. The latter company was disincorporated. The two corporations then entered into a joint venture under the trade name "Monroe Logging Company." The joint venture made payroll reports, which, in form, were identical with the payroll reports theretofore made by the Monroe Logging Company, the corporation, and, in place of paying premiums at the basic rate prescribed by the statute, it paid the experience rating of the old corporation, which had been operating for a number of years and had been paying premiums on an experience rating which was much less than the basic rate. In affirming a judgment of the superior court upholding an order of the supervisor and the joint board making the joint venture liable for premiums at the basic rate, we said, p. 803:

"Appellant recognized the necessity of registering with the state tax commission for tax purposes and of filing reports with the state unemployment compensation division. It seems to us that, if, in contemplation of the social security act and other tax statutes, the Monroe Logging Company lost or changed its identity as of November 10, 1941, as a taxpayer, it then became a new taxpaying entity (employer) in contemplation of § 7676. We do not think that continuity of the operation and retention of the old personnel and management have any bearing upon the construction of the statute. Appellant was under no obligation to retain the old personnel and management, and conceivably, would not have done so had the experience rating of the Monroe Logging Company, the corporation, been on the demerit side of the basic rate instead of on the merit side. It is a fair inference that, had the experience rating of the corporation been more than the basic rate, appellant would

have resisted any attempt on the part of the department to assess premiums on such basis."

The facts in that case are somewhat reversed to those in this action. There, the corporation was dissolved. It had ceased to exist. As an entity it had disappeared. As an employer it had disappeared. There was nothing left for the joint venture to succeed to.

Let us examine the present situation in the light of the statute. A and B enter into a joint venture, become employers AB, and, as such, acquire a certain merit rating. B retires from the business, and A continues the operation. Does A thus become *an employer who shall enter into any business?* No. Does A thus become *an employer who shall resume operations in any work or plant after the final adjustment of his payroll in connection therewith?* No. The Puget Sound Bridge & Dredging Company does not fit into the category of an employer as contemplated by the provisions of § 7676. It succeeded to the operations of Associated Shipbuilders, and it is entitled to the merit rating earned by the joint venture.

The judgment should be reversed. It is so ordered.

MILLARD, C. J., STEINERT, ROBINSON, and JEFFERS, JJ., concur.